**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Paul Molloy and Jacqueline Molloy, h/w on behalf of themselves and all others similarly situated, | : : : | CIVIL ACTION CLASS ACTION |
| | : : | COMPLAINT JURY TRIAL DEMANDED |
| Plaintiffs, | : : |  No. 2:19-cv-03902-AB |
| v. | : : | |
| Aetna Life Insurance Company and Aetna Inc. | : : : | |
| Defendants. | : : : | |

## PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Paul Molloy and Jacqueline Molloy, husband and wife, ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, First Law Strategy Group, LLC and Richard M. Ochroch & Associates, P.C., hereby bring this action seeking relief from Aetna Life Insurance Company and Aetna Inc. (collectively, "Aetna" or "Defendants") which have their principal place of business located at the addresses identified below, and allege as follows based upon personal knowledge, and together with their own acts and experiences, and as to all other matters, based upon information and belief, including investigation conducted by Plaintiffs' attorneys, the undersigned.

### I.     INTRODUCTION

1.     This is a class action brought pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, *et seq.*, on behalf of members, participants, and beneficiaries of employee welfare benefit plans solely administered or administered and insured by Aetna Life

Insurance Company  (through its parent company Aetna Inc.) who were denied proton beam therapy ("Proton Beam Therapy" or "PBT") due to Aetna's uniform application of an arbitrary medical policy, despite Aetna's statutorily-mandated requirement to act as fiduciaries with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purposes of: (1) providing benefits to participants and their beneficiaries; and (2) defraying reasonable expenses of administering the plan.  Due to this breach of fiduciary duty, Aetna violated its own statements to plan participants and beneficiaries to the contrary when it stated that it would, in fact, deliver access to medically necessary healthcare for the treatment of cancer.

2.      At the crux of this case is the seemingly never-ending conflict between duly-licensed physicians prescribing appropriate treatment (like Proton Beam Therapy, which has been recognized for decades by the medical community and the FDA as being within the generally accepted standards of medical practice, and a clinically appropriate treatment for cancer) and/or the fiduciary-insurer of an ERISA-regulated employee welfare benefit plan which substitutes its judgment for that of the treating physicians and denies treatment as not "medically necessary" and as "experimental or investigational."

3.      Named Plaintiff, Paul Molloy ("Paul"), is currently a young, otherwise healthy, 36-year old man who underwent brain surgery for a tumor located in his right temporal lobe. Notwithstanding the success of the treatment, the facts of Paul's interaction with Aetna are common to anyone insured by, or for whom, Aetna administers their health plan.

4.      Following successful surgery and removal of approximately 80% of his tumor, Paul's doctors recommended post-operative radiation, specifically with Proton Beam Therapy, at the Penn Medicine Roberts Proton Therapy Center, which is part of the Hospital of the University

of Pennsylvania ("HUP").  HUP is a world class medical, research and teaching facility located in Philadelphia, Pennsylvania.

5.      Proton Beam Therapy is more accurate than other available radiation treatments such as traditional photon, *i.e.*, x-ray, radiation as it allows the physician to deliver full or higher doses of radiation while sparing surrounding healthy tissues and organs.  Proton Beam Therapy can also reduce the risk of a second malignancy by reducing the volume of radiated normal, healthy tissue.

6.      Accordingly, for patients like Paul, Proton Beam Therapy is a more effective treatment than other radiotherapies given, in that it not only destroys the tumor, but also reduces the risk of recurrence.  And, importantly for Paul, Proton Beam Therapy reduces the risk of long-term (even permanent) neurocognitive side effects associated with irradiating parts of the brain that surround the tumor which do not themselves require radiation but are irradiated nonetheless, due to their proximity to the tumor (i.e. those are parts of the brain in the "fallout" zone of the radiation).

7.      Indeed, for those individuals like Paul who have been prescribed Proton Beam Therapy, this type of radiation is the only kind that could not only help cure their cancer, but could also significantly limit radiation exposure and resulting damage to surrounding healthy cells, tissues, or organs, by targeting the tumor with radiation and limiting the "fallout" damage to other parts of the brain.

8.      In fact, Proton Beam Therapy is approved for use by other private (commercial) and government-sponsored health insurance companies.

9.      Proton Beam Therapy has also been approved by the FDA for treatment of cancer since 1988.

10.     Aetna itself acknowledges that Proton Beam Therapy is an effective, medically necessary treatment of malignant tumors that is neither experimental, nor investigational, for some claimants.

11.     The currently available data reveals that there are at least 30 operational proton therapy centers in the United States, the majority of them having been constructed since 2010.[1]

12.     Indeed, the Roberts Proton Therapy Center at the Penn Abramson Cancer Center was built in 2010 for just this purpose.  It is the largest facility in the world for the use of this therapy and is one of the few proton therapy centers that is fully integrated with a National Cancer Institute (NCI)-designated comprehensive cancer center.[2]

13.     Despite the long-studied benefits of Proton Beam Therapy, the proliferation of proton therapy centers, and the payment for Proton Beam Therapy by other private insurers and government-sponsored insurance plans, Aetna denied Paul's pre- and post-operative requests for approval of his Proton Beam Therapy, and his post-operative request for reimbursement, for the charges associated with his Proton Beam Therapy.  Ignoring Paul's own physician's advice[3] and not acting in Paul's interests (and, indeed, contrary to the interests of all Aetna members, participants and beneficiaries of its health insurance plans), Aetna denied Paul's requests for both preapproval and post-treatment reimbursement.

---

[1] *See* National Association for Proton Therapy, at https://www.proton-therapy.org/.

[2] *See* Penn Medicine Abramson Cancer Center, at https://www.pennmedicine.org/cancer/navigating-cancer-care/treatment-types/proton-therapy

[3] Paul's main physician is Dr. Robert Lustig, Chief of Clinical Operations in Radiation Oncology at Penn Medicine, a Professor of Clinical Radiation Oncology at the University of Pennsylvania School of Medicine, who himself has authored numerous publications on proton therapy treatment.  *See* https://www.med.upenn.edu/apps/faculty/index.php/g20002680/c1744/p16732.

14.     Aetna's multiple denials of Paul's requests for Proton Beam Therapy were for specious reasons, claiming that the procedure is "experimental and investigational."[4]  Yet in truth, Proton Beam Therapy has been in existence, and producing successful outcomes, for decades.

15.     Undoubtedly, Proton Beam Therapy costs more than traditional radiation (*i.e.*, photon therapy); and this is the actual (yet unstated) reason for Aetna's denial.

16.     Undeterred by Aetna's pre-treatment denials and claims that Proton Beam Therapy was "experimental and investigational," Paul trusted Dr. Lustig and paid for the Proton Beam Therapy treatment from his own funds.  As a result of the Proton Beam Therapy, Paul has thankfully had positive results and has had no evidence of recurrence of the cancer a year-and-a-half after treatment, with no discernible side effects from radiation.

17.     Plaintiffs have therefore brought this class action on behalf of themselves and all others similarly situated so that this Court can determine whether Aetna's "one-size-fits-all" approach to Proton Beam Therapy treatment for cancer violates its statutorily-mandated obligation to discharge its fiduciary duty solely in interest of the Plan's participants and beneficiaries exclusively for the purpose of providing benefits and defraying costs.

18.     Plaintiffs allege that Aetna's conduct "lulled" them and members of the class into a false sense of security by promising to provide medical treatment for cancer and thereafter failing to do so.  As such, Aetna's conduct breached its fiduciary duty.  Plaintiffs and the Class are therefore entitled to remedy Aetna's breaches of fiduciary duties pursuant to ERISA's civil enforcement section found in the statute at 29 U.S.C. § 1132(a)(3), to enforce their rights under the Plan and to seek a clarification of rights to future benefits, on behalf of themselves and all

---

[4] Although used in the medical profession, the phrases "medically necessary" and "experimental and investigational" as used by Aetna are terms of art in the insurance industry and defined by Aetna and other insurers like Aetna.  Those definitions are <u>not</u> the definitions employed by the medical professionals.

others who have been prescribed Proton Beam Therapy by doctors, but denied under the Plan for the same, specious reasoning.

## II.   JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), as it involves claims for breach of fiduciary duty under employee benefit health plans regulated and governed by ERISA.

20.     Defendants regularly and systematically conduct business within the Commonwealth of Pennsylvania and this judicial district.  Aetna maintains offices in Blue Bell and Philadelphia, Pennsylvania.  Personal jurisdiction is, therefore, properly exercised over the Defendants.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 as a substantial part, if not all, of the events and/or omissions giving rise to the Plaintiffs' claims emanated from activities within this jurisdiction, wherein Defendants also conduct substantial business. Furthermore, the Plan and the "policy of insurance" issued by Aetna were all delivered to Plaintiffs in this judicial district.

## III.   THE PARTIES

22.     Plaintiffs Paul Molloy and Jacqueline Molloy are husband and wife and adult citizens of the Commonwealth of Pennsylvania, residing in Newtown Square, Pennsylvania 19073.

23.     At all times relevant, Plaintiff Jacqueline Molloy is and has been employed by The Vanguard Group, Inc. ("Vanguard"), working at its location in Malvern, Pennsylvania.

24.     As an employee of Vanguard, Plaintiff Jacqueline Molloy is entitled to participate in its employee welfare benefit plan known as "Choice POS II with Aetna Health Fund Benefit Plan" (hereinafter, the "Plan").  As noted above, the Plan is an "employee welfare benefit plan"

established by Ms. Molloy's employer, Vanguard, and regulated by ERISA. *See* Aetna 2018 Choice POS II Benefit Plan, prepared exclusively for the Vanguard Group, a true and correct copy of which is attached hereto as Exhibit "A."[5] *See also* 29 U.S.C. § 1002(1).

25.    The Plan is offered and funded by Vanguard and administered by Aetna Life Insurance Company. *See* Exhibit A, at p. 92, "Additional Information." As such, Aetna is both a "person" and the "administrator" of the Plan as those terms are defined in 29 U.S.C. §§ 1002(9) (person) and 1002(16)(A) (administrator).

26.    At all times relevant to this action, Plaintiff Jacqueline Molloy was and is a "participant" of the Plan as that term is defined by ERISA, 29 U.S.C. § 1002(7).

27.    At all times relevant hereto, Plaintiff Paul Molloy was and is a "beneficiary" of the Plan as that term is defined by ERISA, 29 U.S.C § 1002(8).

28.    Defendant Aetna Life Insurance Company ("ALIC") is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business located at 151 Farmington Ave., Hartford, Connecticut, 06156. ALIC is a wholly-owned subsidiary of Aetna Inc.

29.    ALIC is licensed by the Commonwealth of Pennsylvania Department of Insurance to conduct business as an insurance company in the Commonwealth of Pennsylvania.

30.    Defendant Aetna Inc. is the parent company of ALIC. It is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 151 Farmington Ave., Hartford, CT 06156.

---

[5] It is undisputed that Paul's treatment and pre-service request for authorization together with Aetna's pre-service denials of his claims took place in 2017. Nevertheless, denials of Aetna's denials of Paul's post-service request for reimbursement and Aetna's corresponding denials of those requests occurred all through 2018 and culminated in February 2019 with Aetna's final denial. Accordingly, three plan years may be implicated: 2017; 2018; and 2019. Plaintiffs have attached the 2018 Plan because they are in possession of that Plan and upon information and belief, do not believe it deviates in any meaningful substantive aspect from the 2017 Plan.

31.     Upon information and belief, Defendant ALIC, through its parent corporation Aetna Inc., is in the business of providing, administering and insuring health plans to consumers in this judicial district.

32.     In addition, Aetna Inc. authored and/or copyrighted the Aetna 2017 Clinical Policy Bulletin ("CPB") 0270, upon which ALIC and Aetna's outside reviewers based their denials, as set forth, *infra*, in paragraphs 50-51.  *See also*, Exhibit D.

33.     As used in this Complaint, "Aetna" includes both ALIC and Aetna Inc.

34.     Aetna is an ERISA "fiduciary" with respect to Mr. and Mrs. Molloy's plan and the plans of all putative class members in that Aetna is a "person" as defined by the statute and exercises discretionary authority or discretionary control with respect to the management of the plans; exercises discretionary authority or discretionary control with respect to the management or disposition of the assets of the plans; or has discretionary authority or discretionary responsibility in the administration of the plans.  *See* 29 U.S.C. § 1002(21)(A).  In addition, Aetna is the Plan's designated "administrator."

## IV.     FACTUAL BACKGROUND

### Diagnosis and Recommendation for Proton Beam Therapy

35.     Paul Molloy is a 36 year-old man who first began experiencing lightheadedness, tinnitus and bilateral arm-tingling in early 2016.  Following a Head CT scan in May 2017 and a brain MRI, he was diagnosed with a brain tumor (WHO II, low-grade oligodendroglioma) in his right temporal lobe.

36.     Oligodendroglioma is a malignant, central-nervous-system, or "CNS," tumor, and constitutes an "illness," as defined by the Plan.  See *infra.*

37.     On June 19, 2017, Paul underwent a craniotomy (i.e., brain surgery) of his right temporal lobe at the Hospital of the University of Pennsylvania Department of Radiation and Oncology, which was successful in removing approximately 80% of his tumor.

38.     Following surgery, his surgical team recommended that he receive post-operative radiation with Proton Beam Therapy.

39.     Proton Beam Therapy, as opposed to traditional radiation techniques such as *photon* beam therapy, allows for precision of the accelerated particle proton beam and control of the dosage delivered to the tumor site, while at the same time sparing surrounding healthy cells, tissue or organs from radiation damage.

40.     Alternately, *photon* therapy enters the area (in Paul's case, his brain) on the one side and exits the area on the other side, exposing healthy cells, tissue and organs in its path to damage caused by radiation. (*i.e.*, radioactive "fallout" damages healthy cells which are not in need of treatment).

41.     Research shows that radiation exposure to the hippocampus (which can result from exposing the brain to photon beam treatment) can result in cognitive impairments.

42.     Specifically for Paul, the use of Proton Beam Therapy would be more likely to spare his entire left temporal lobe, including the hippocampus, from exposure to damaging radiation, unnecessary to the treatment of his tumor.  (*i.e.*, with Proton Therapy there was a significantly lower chance that the radioactive "fallout" would injure Paul's hippocampus). As Paul is right-handed, the left frontal lobe is his dominant lobe, which controls thought, speech, purposeful movement and personality.   *See* Lustig 9/8/2017 Precertification Request, "Assessment" section, a true and correct copy of which is attached hereto as Exhibit "B."

43.     Paul's physician, Dr. Lustig (the director of the Network Development Program and professor of Clinical Radiation Oncology of the Perelman School of Medicine at the University of Pennsylvania and board-certified therapeutic radiologist at the Hospital of the University of Pennsylvania) specifically advised the use of Proton Beam Therapy, as it:

- "[Is] More accurate than other kinds of radiation, allowing the physician to deliver full or higher doses while sparing surrounding healthy tissues and organs

- Can reduce long term neurocognitive side effects

- Reduces the risk of a second malignancy by reducing the volume of radiated normal tissue

- Protect[s] import [sic] structures of the brain including the hippocampus, hypothalamus, pituitary, optic structures, temporal lobes and cochlea."

Exhibit B, at p. 1.

44.     Paul's wife, Jacqueline, maintains a health insurance plan through her employer, Vanguard.  This plan is administered by Aetna (ID Number W0000027841).  Mr. Molloy is a covered beneficiary under his wife's Aetna plan.

45.     On September 8, 2017, Dr. Lustig requested precertification from Aetna for Paul's proton therapy treatment.  With his precertification request, Dr. Lustig submitted his professional assessment, along with a Proton Beam Radiotherapy Precertification Information Request Form, an Ambulatory Precertification Response, and a copy of Mr. Molloy's relevant medical records. *See* Exhibit B.

## The Plan

46.     Paul is, and was at all relevant times, covered as a beneficiary by the Plan, the relevant terms of which are as follows:

**Pp. 3-4: How Your Medical Plan Works**
This Aetna Choice POS II medical plan provides coverage for a wide range of medical expenses for the treatment of illness or injury. It does not provide benefits for all medical care…
The plan will pay for covered expenses up to the maximum benefits shown in this Booklet. Coverage is subject to all the terms, policies and procedures outlined in this Booklet. Not all medical expenses are covered under the plan. Exclusions and limitations apply to certain medical services, supplies and expenses. Refer to the *What the Plan Covers, Exclusions, Limitations* sections and *Schedule of Benefits* to determine if medical services are covered, excluded or limited.

**P. 12: Requirements for Coverage**
To be covered by the plan, services and supplies must meet all of the following requirements:

1.   The service or supply must be covered by the plan. For a service or supply to be covered, it must:

- Be included as a covered expense in this Booklet;
- Not be an excluded expense under this Booklet. Refer to the *Exclusions* sections of this Booklet for a list of services and supplies that are excluded.

…

3.   The service or supply must be **medically necessary**. To meet this requirement, the medical services or supply must be provided by a **physician**, or other health care provider, exercising prudent clinical judgment, to a patient for the purpose of preventing, evaluating, diagnosing or treating an **illness**, **injury**, disease or its symptoms. The provision of the service or supply must be:

(a)   In accordance with generally accepted standards of medical practice;

(b)   Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's **illness**, **injury** or disease; and

(c)   Not primarily for the convenience of the patient, **physician** or other health care provider;

(d)   And not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's **illness**, **injury** or disease.

**P. 15: What the Plan Covers**
**Aetna Choice POS II Medical Plan**
Many preventive and routine medical expenses as well as expenses incurred for a serious illness or injury are covered. This section describes which expenses are covered expenses. Only expenses incurred for the services and supplies shown in this section are covered expenses. Limitations and exclusions apply.

**P. 36: Specialized Care**
**Radiation Therapy Benefits**
Covered expenses include charges for the treatment of **illness** by x-ray, gamma ray, accelerated particles, mesons, neutrons, radium or radioactive isotopes.

**P. 47: Medical Plan Exclusions**
Not every medical service or supply is covered by the plan, even if prescribed, recommended or approved by your **physician** or **dentist**. The plan covers only those services and supplies that are medically necessary and included in the *What the Plan Covers* section. Charges made for the following **are not covered** except to the extent listed under the *What the Plan Covers* section or by amendment attached to this Booklet (emphasis added).

**P. 50: Experimental or investigational** drugs devices, treatment or procedures, except as described in the *What the Plan Covers* section.

**P. 75: Definitions: Experimental or Investigational**
A drug, a device, a procedure, or treatment will be determined to be **experimental or investigational** if:

- There are insufficient outcomes data available from controlled clinical trials published in the peer-reviewed literature to substantiate its safety and effectiveness for the **illness** or **injury** involved; or

- Approval required by the FDA has not been granted for marketing; or

- A recognized national medical or dental society or regulatory agency has determined, in writing, that it is **experimental** or **investigational**, or for research purposes; or

- It is a type of drug, device or treatment that is the subject of a Phase I or Phase II clinical trial or the experimental or research arm of a Phase III clinical trial, using the definition of "phases" indicated in regulations and other official actions and publications of the FDA and Department of Health and Human Services; or

- The written protocol or protocols used by the treating facility, or the protocol or protocols of any other facility studying substantially the same: drug; device; procedure; or treatment, or the written informed consent used by the treating facility or by another facility studying the same drug, device, procedure, or treatment states that it is **experimental or investigational**, or for research purposes."

**P. 78: Definitions: Illness**
A pathological condition of the body that presents a group of clinical signs and symptoms and laboratory findings peculiar to the findings set condition apart as an abnormal entity differing from other normal or pathological body states.

*See* Exhibit A (emphasis original and supplied).

### Aetna's Pre-Certification Internal Denial

47.    On September 8, 2017, within hours of Dr. Lustig's request, Aetna denied Paul's request for precertification.  *See* Aetna September 8, 2017 "Level 1 Appeal Decision," a true and correct copy of which is attached hereto as Exhibit "C."

48.    In denying this request, Aetna stated, "The basis for our determination is that Aetna considers proton beam radiotherapy experimental and investigational for oligodendroglioma.  This is based on the CPB referenced above."  *See* Exhibit C.  The denial also cites Aetna's "Experimental and Investigational" definition from its Plan (at p. 75, cited *supra*) in its denial.

49.    The original denial states it was authored by an "Aetna medical director, board certified in family medicine with a designation of medical doctor and a complaint and appeal registered nurse."  *See* Exhibit C, at p. 2.

50.    The CPB Aetna referenced in its denial relates to Aetna's May 12, 2017 Clinical Policy Bulletin ("CPB") Number 0270 on Proton Beam and Neutron Beam Radiotherapy, stating that "[m]edical studies have not proven that this procedure is effective for treatment" of Paul's condition.  *See* May 12, 2017 Aetna CPB 0270, a true and correct copy of which is attached hereto as Exhibit "D," and can be found in later iterations online at http://www.aetna.com/cpb/medical/data/200_299/0270.html.

51.    The May 12, 2017 CPB states, in relevant part:

I.    Aetna considers proton beam radiotherapy (PBRT) medically necessary in *any* of the following radiosensitive tumors:
- Chordomas or chondrosarcomas arising at the base of the skull or cervical spine without distant metastases; *or*
- Malignancies in children (21 years of age and younger); *or*

•       Uveal melanomas confined to the globe (i.e., not distant metastases) (the uvea is comprised of the iris, ciliary body, and choroid [the vascular middle coat of the eye]).[6]

…

III.     Aetna considers proton beam radiotherapy experimental and investigational for all other indications, including the following indications in adults (over age 21) (not an all-inclusive list) because its effectiveness for these indications has not been established…

52.     The list of indications on the May 12, 2017 CPB No. 0270 contained approximately 60 exclusions, including "Oligodendroglioma."

53.     The May 12, 2017 CPB No. 0270 states that Proton Beam Therapy is medically necessary for "[m]alignancies in children (21 years of age and younger)," confirming that Aetna did **not** consider Proton Beam Therapy experimental, nor investigational, for the treatment of malignant CNS tumors – such as oligodendroglioma, for all claimants.

54.     Accordingly, Aetna's statement in the denial letter issued to Paul – that "Aetna considers proton beam radiotherapy experimental and investigational for oligodendroglioma" – is false.

55.     Although the version of the May 12, 2017 CPB No. 0270 is listed as being updated on July 29, 2019 and May 9, 2018 (and prior to that, on May 12, 2017), the majority of its studies and peer-reviewed literature date prior to 2014. The current version contains only a handful of references to 2018 or 2019 studies.

56.     On September 12, 2017, Dr. Lustig appealed Aetna's decision and faxed another precertification request to Aetna on behalf of Paul.

57.     Aetna responded to this second request on September 13, 2017, upholding its previous decision and citing the same set of factors in its original September 8th denial. *See* Aetna

---

[6] This 2017 CPB has since been revised twice (May 9, 2018 and July 29, 2019) and the 2019 version was updated to include coverage for "[l]ocalized unresectable hepatocellular carcinoma (HCC)" in certain medical situations.

September 13, 2017 Final Appeal Decision, a true and correct copy of which is attached hereto as Exhibit "E."

58.     This September 13, 2017 Decision was authored by a Janet Conway, RN, an Appeals Nurse consultant in Aetna's National Clinical Appeals Unit, and states that an Aetna medical director, board certified in internal medicine and oncology with a professional designation of MD and a registered nurse *participated* in the appeal.  *Id.*

### Pre-Certification External Review Denial

59.     Following the denial of his appeal, Paul submitted an external review to a MCMC Federal ERO Review Team – an independent review organization ("IRO") selected by Aetna, and with whom Aetna directly contracts.

60.     Paul's extremely thorough letter noted that Proton Beam Therapy is permitted for children under 21 and adults over 65 for the same reasons his physician stated it should be administered to Paul.  Molloy October 6, 2017 Letter, a true and correct copy of which his attached hereto as Exhibit "F".   Accordingly, adults between the ages of 21 and 65 (like Paul) are automatically precluded from coverage for Proton Beam Therapy by any Plan Aetna administers and/or insures, despite Aetna affording plan members outside this age range coverage for Proton Beam Therapy to treat the very same illnesses – including, but not limited to, CNS tumors such as oligodendroglioma.

61.     Paul also noted in his appeals that proton beam therapy for primary CNS tumors was not, in fact, "experimental and investigational," as recognized by the American Society for Radiation Oncology ("ASTRO"), in other recent studies, and by Paul's own doctors.

62.     Indeed, Paul noted that other insurers, such as Blue Cross and Medicare/Medicaid, cover Proton Beam Therapy.  *See* Nikhil G. Thaker, MD et al., Variations in Proton Therapy

Coverage in the State of Texas: Defining Medical Necessity for a Safe and Effective Treatment, International Journal of Particle Therapy (2016), 500-508 (stating BCBS-TX and Medicare consider Proton Beam Therapy medically necessary for cancers of the central nervous system and for localized prostate cancers).[7]

63.    Paul stated that Proton Beam Therapy was not investigational or experimental because: (1) it has been used to treat patients since the mid-1950s; (2) was approved for use in 1988 by the U.S. Food and Drug Administration; and (3) Medicare and Medicaid began covering the procedure in 2000.  Exhibit F, at 2.

64.    Three of the cited studies demonstrated that Proton Beam Therapy is more likely to produce superior therapeutic results to traditional photon therapy, especially because of its reduced negative effect on the surrounding healthy organs and tissues caused by radiation damage:

- *Proton Therapy for Low Grade Gliomas: Results from a Prospective Trial*[8]: "Proton radiation therapy offers an alternative to photon-based radiation therapies as a means of markedly reducing excess doses to surrounding normal tissue, thereby potentially mitigating adverse effects on neurocognitive and neuroendocrine function for patients with brain tumors."

- *Mayo Clinic: Clinical Case of Individuated Use of Proton Beam Therapy*[9]: "And because proton beam therapy can spare healthy tissue from radiation exposure, as compared to the best x-ray techniques, it is widely believed that this will yield to a lower risk of radiation-induced cancers… **Some estimates are that proton beam radiation can decrease the risk of a radiation-induced cancer by as much as 10-fold**."

- *Should Randomized Clinical Trials Be Required for Proton Radiotherapy?*[10]:
    - "In brief, the arguments for use of protons in radiation therapy are as follows: (1) Owing primarily to their depth dose characteristics, the dose distributions that can be achieved with protons are in almost all cases superior to those possible with x-rays; (2) there is virtually no difference in tissue response per unit does between

[7] Available at https://theijpt.org/doi/pdf/10.14338/IJPT-15-00029.1, at Table 2.
[8] Helen A. Shih, MD, *et. al.*, "Proton Therapy for Low Grade Gliomas: Results from a Prospective Trial," *Cancer*, 13 Jan. 2015, found at https://onlinelibrary.wiley.com/doi/full/10.1002/cncr.29237
[9] Mayo Clinic, found at https://www.mayoclinic.org/documents/the-clinical-case-for-individualized-use-of-proton-beam-therapy/doc-20145258.
[10] Goitein, Michael, James D. Cox, "Should Randomized Clinical Trials Be Required for Proton Radiotherapy?" *Journal of Clinical Oncology*, 2008, 26(2), pp. 175–176, found at https://ascopubs.org/doi/10.1200/JCO.2007.14.4329

protons of therapeutic energies as compared with x-rays, so that the only relevant differences are physical; and (3) **radiation delivered to normal tissues causes damage to them, just as it does to tumors, and the severity of that damage increases with increasing doses.** None of these points are contested by any of the critics of the use of proton beam therapy, as these points are demonstrated facts."

o "It is therefore hard to imagine how any objective person could avoid the conclusion that there is, at the very least, a high probability that protons can provide superior therapy to that possible with x-rays in almost all circumstances. It is primarily for this reason that the practitioners of proton beam therapy have found it ethically unacceptable to conduct RCTs [randomized clinical trials] comparing protons with x-rays. Such a comparison would not meet a central requirement for performing RCTs, namely that there be equipoise between the arms of the trial."

o "Of course, it is really all about money. Can anyone seriously believe that, if protons were cheaper than x-rays, there would be similar objections raised as to their immediate and widespread use?"

65.     Plaintiffs' letter also cited to a July 2017 ASTRO article[11] describing ASTRO's revised Proton Beam Therapy Model Policy that detailed which cancer diagnoses met ASTRO's evidence-based standards and should be covered by private insurers and Medicare. *Id.* At 3.

66.     ASTRO is the premier radiation oncology society in the world, with more than 10,000 members who are physicians, nurses, biologist, physicists, radiation therapists, dosimetrists and other health care professionals who specialize in treating patients with radiation therapies. See https://www.astro.org/About-ASTRO/History. It describes itself as "dedicated to improving patient care through professional education and training, support for clinical practice and health policy standards, advancement of science and research, and advocacy. ASTRO publishes three medical journals, International Journal of Radiation Oncology; Biology; Physics, Practical Radiation Oncology and Advances in Radiation Oncology. *Id.*

67.     In its Revised Proton Beam Therapy Model Policy, ASTRO stated that Proton Beam Therapy "is considered reasonable in instances where sparing the surrounding tissue cannot be adequately achieved with photon-based radiotherapy and is of added clinical benefit to the

---

[11] Available at https://www.astro.org/News-and-Publications/News-and-Media-Center/News-Releases/2017/ASTRO-updates-insurance-coverage-recommendations-f

patient." *See* ASTRO Model Policies, Proton Beam Therapy, a true and correct copy is attached hereto as Exhibit "G," at 4.[12]   ASTRO lists four instances, one of which as when "[t]he target volume is in close proximity to one or more critical structures and a steep dose gradient outside the target must be achieved to avoid exceeding the tolerance dose to the critical structure(s)." *Id.*

68.     Significantly, ASTRO also updated its Group 1 indications, which represent the clinical scenarios **that frequently support the use of proton therapy based on medical necessity and published clinical data**.  These indications include a list of 11 general indications, *including* "**Malignant and benign primary CNS tumors.**" *Id.*, at 4-5 (emphasis added).

69.     Paul himself suffered from such a malignant CNS tumor.

70.     This change to the ASTRO guidelines was made **three months (June 2017)** *before* **Aetna's initial September 8, 2017 denial of Paul's precertification request.**

71.     Still, MCMC denied Paul's External Review on **October 6, 2017**.  *See* October 6, 2017 Denial, a true and correct copy of which is attached hereto as Exhibit "H."

72.     In its denial, MCMC stated: "there is insufficient clinical data in the medical literature to show that proton is equivalent or superior to other treatment options such as photon therapy for primary brain tumors." *Id.*, at 2.

73.     It also stated that Proton Beam Therapy is considered to be investigational/experimental because, according to the Aetna Summary Plan Description, "it is a type of drug, device or treatment that is the subject of a Phase I or phase II clinical trial or the experimental or research arm of a Phase III clinical trial."  (emphasis added).[13]

---

[12]Also available at
https://www.astro.org/uploadedFiles/_MAIN_SITE/Daily_Practice/Reimbursement/Model_Policies/Content_Pieces/ASTROPBTModelPolicy.pdf
[13] Simply put, the external reviewer concluded Proton Beam Therapy was investigational and/or experimental based upon the definition of those words *written by Aetna*.  Thus, MCMC's conclusion applied the insurance industry's,

74.     Finally, MCMC stated that Proton Beam Therapy was not medically necessary because it is "more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury, or disease." *Id.*[14]

75.     The MCMC Reviewer's most recent reference was the same 2015 trial cited by Paul in his appeal submissions, but did not cite the more recent 2017 ASTRO Model Policy guidelines, or *any* academic study or reference post-dating that 2015 study.

76.     The MCMC Reviewer noted that he is board certified in Radiation Oncology, and that he is a member of ASTRO, as well as the Radiological Society of North America.  Still, this Reviewer issued his/her decision without any consideration of the new 2017 ASTRO Model Policy, adopted at least four months prior to MCMC's rejection of the appeal.

77.     Importantly, the MCMC Reviewer utilized the CPB in reaching his conclusions. *See* Exhibit H, at 4.

### Post-Service Claim Submissions and Denials

78.     As proton therapy was Paul's only valid option to ensure that his surrounding brain tissue be spared radiation, he and his family paid for his treatment out-of-pocket, at a discounted cost of approximately $50,000.

79.     Paul received proton beam therapy radiation treatment for his brain tumor at HUP starting in October 2017 and finishing in December 2017.

---

rather than the medical profession's, definition of investigational/experimental.  Moreover, Aetna did not deny Paul's claim because Proton Beam Therapy was the subject of clinical trials.  Rather, Aetna clearly and explicitly considered this treatment investigational and experimental for one reason and one reason only: "because its effectiveness [for Paul's CNS tumor] has not been established."  See Exhibit "D," pg. 1.

[14] Significantly, MCMC did not contest that Proton Beam Therapy was "(a) In accordance with generally accepted standards of medical practice; (b) Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for [Mr. Molloy's] **illness**, **injury** or disease; and (c) Not primarily for the convenience of the patient, physician or other health care provider."  *See* Ex. A, Plan's Definition of "Medically Necessary," at p. 12 (emphasis in original).

80.     Paul submitted post-service claims and appeals for reimbursement to Aetna on January 4, 2018 and July 20, 2018; submitting his similar extensive documentation and research on proton beam therapy.

81.     Aetna denied both the Level 1 and Final Appeals on January 25, 2018 and August 7, 2018, finding the services to be "experimental or investigational." *See* Jan. 25, 2018 and August 7, 2018 Aetna Denial Letters, attached hereto as Exhibit "I" and "J."[15]   Aetna utilized the CPB in both its Level 1 and Final Appeals.

82.     Paul then submitted his external review to Independent Medical Expert Consulting Services ("IMEDECS") – an IRO selected by Aetna, and with whom Aetna directly contracts.

83.     On October 10, 2018, IMEDECS denied this external review appeal, also concluding that the treatment requested is "experimental/investigational." *See* October 10, 2018 IMEDECS Letter, attached hereto as Exhibit K.

84.     Interestingly, the IMEDECS reviewer, who stated he/she was a medical doctor (MD) board certified in radiation oncology, also stated that "The American Society for Radiation Oncology (ASTRO) emerging technology committee report on proton therapy specifically states that more clinical data are needed to fully establish the role of proton beam therapy in CNS tumors."   However, the reviewer does not cite any date for this committee report, but internet searches reveal this report to have been published **in 2012**.  *See* Allen AM, "An evidence based review of proton beam therapy: the report of ASTRO's emerging technology committee," *Radiother Oncol.* 2012 Apr;103(1):8-11.[16]  **It is likely that the IMEDECS Reviewer lifted this**

---

[15] The first denial was authored by "an Aetna medical director, board certified in oncology medicine and a complaint and appeal nurse," and the second denial was authored by "an Aetna medical director, board certified in Internal Medicine with a professional designation of Doctor of Medicine (MD), a complaint and appeal nurse, with a professional designation of Registered Nurse "RN", and a complaint and appeals analyst." *See* Exhibits I and J.  ***No one* certified in Radiation Oncology participated in these internal appeals.**
[16] Available at https://www.ncbi.nlm.nih.gov/pubmed/22405807.

**directly from Aetna's CPB No. 0270, which itself does not contain the updated 2017 ASTRO Model Policy Guidelines.**[17]

85.     In fact, as stated *supra*, though the CPB No. 0270 cites to approximately 100 studies from 2006-2014, it only contains a handful of studies and peer-reviewed literature references after that year, despite the CPB being reviewed and revised every year since 2008.

86.     And yet, though the IMEDECS reviewer's denial report was prepared more than a year after ASTRO adopted the new Model Policy (which actually recommends the use of proton therapy to treat CNS tumors), the reviewer makes no mention of the new 2017 ASTRO Model Policy, or any post-2015 studies at all.  *Id.*, at 3.

87.     Again, the IMEDECS reviewer utilized the CPB in reaching his conclusions.

88.     Paul submitted his final, external review to the Medical Review Institute of America, LLC ("MRIoA") on January 3, 2019 – an IRO selected by Aetna, and with whom Aetna directly contracts.  MRIoA upheld the previous denials and issued its final denial on February 7, 2019 based on the **experimental/investigational exclusion** and Aetna CPB Number 0270.  *See* Feb. 7, 2019 Denial, a true and correct copy of which is attached hereto as Exhibit "L."

89.     Once again, the final MRIoA review utilized the CPB in affirming the denial of Paul's benefits.

90.     In sum, Aetna is responsible for and committed the course of conduct described herein, including but not limited to the following:

    a.     Aetna has created, implemented, and relied upon CBP No. 0270 to deny claims for Proton Beam Therapy, despite CBP No. 0270 containing guidelines much more restrictive than the generally accepted standards of medical practice.

---

[17] The most recent updated version of Aetna's CPB No. 00270 from July 29, 2019 <u>does</u> finally reference the 2017 ASTRO updated guidelines, but states that the "ASTRO model policy states that it is not a clinical guideline and that it was created for insurance reimbursement purposes."

b. Aetna has failed to properly update CPB No. 0270, as it relies upon outdated medical evidence and ignores contemporary medical evidence, insofar as May 2017 CPB No. 0270[18] provides that Proton Beam Therapy is covered for insured members in only three, extremely limited, circumstances:
- Chordomas or chondrosarcomas arising at the base of the skull or cervical spine without distant metastases; or
- Malignancies in children (21 years of age and younger);
- Uveal melanomas confined to the globe (i.e., not distant metastases) (the uvea is comprised of the iris, ciliary body, and choroid [the vascular middle coat of the eye]).

c. Aetna implemented policies and procedures for prior authorization review and the adjudication of insured members' claims that provide for an inadequate review of clinical records by its medical directors prior to rendering a determination of coverage.

d. Aetna compounds its bad faith breach of fiduciary duties, and confounds learned health care providers, by having CPB No. 0270 reviewed and applied to insured members' requests for prior authorization and in the adjudication of insured members' claims by medical directors who are unqualified to render determinations of coverage for Proton Beam Therapy, including by its internal medical directors who are not board certified in the requisite specialty, and yet are charged with making life and death decisions for members who are entirely reliant upon the Plan for timely access to medically necessary services.[19]

e. By placing CPB No. 0270 in the hands of medical directors who are not qualified to render opinions as to the medical necessity of Proton Beam Therapy; who lack the education, training and experience to appreciate factors in a given case that indicate the medical necessity for Proton Beam Therapy; who are unaware of contemporary medical evidence in the requisite specialty indicating the medical necessity for Proton Beam Therapy; and who follow the inadequate policies and procedures for clinical review, Aetna categorically denies all prior authorization requests and claims for Proton Beam Therapy for all types of cancers on CPB No. 0270's "not indicated" list, including brain tumors.

91.    **In other words, the external reviewers simply rubber-stamped Aetna's prior, internal denials using Aetna's own incomplete, arbitrary, medically unreasonable and**

---

[18] As noted, *supra*, the July 2019 CPB has added coverage for "localized unresectable hepatocellular carcinoma" in only very particularized settings.
[19] **Indeed, unlike Paul's physician, *none* of the internal Aetna denials were authored by physicians board-certified in radiation oncology.**

**internally inconsistent Policy**, without conducting any *truly* independent evaluations of whether Proton Beam Therapy is a proven and effective treatment for Plaintiff's diagnosed cancer.

92.    Aetna has chosen to rely on the opinions of its internal medical reviewers, despite their lack of requisite qualifications and expertise in the specific radiation oncology field, and/or obvious ignorance of current relevant medical opinions, rather than relying on or even giving any weight to the opinions of *their patient's* own properly board-certified health care providers.

93.    Paul was forced to incur approximately $50,000 for Proton Beam Therapy treatment, without any assistance from Aetna.   Fortunately, Paul was able to afford such a procedure.   Paul has had no evidence of recurrence of the cancer for over a year-and-a-half, and without any of the harmful side effects that photon therapy can cause.

94.    Paul now pursues this fight for change, individually and on behalf of the Class Members, particularly those less fortunate and unable to bear the economic expense of Proton Beam Therapy treatment, so that Aetna's insured members suffering with cancer can focus on their recovery rather than on the extreme and outrageous anxiety and distress of wrongful coverage denials and the crippling cost of care.[20]

95.    Under ERISA, Plaintiffs and the Class members are entitled to equitable and declaratory relief enjoining the application of the Aetna CPB No. 0270 and denying benefits coverage for Proton Beam Therapy prescribed by a doctor and awarding other such relief the Court finds appropriate.

---

[20] As United States District Court Judge Robert N. Scola, Jr. (S.D. Fla.) recently wrote in his recent April 29, 2019 Order recusing himself from *Cole v. United Healthcare Insurance Co.*, 1:19-cv-21258 (Doc. 6) (a class action suit against insurer of wrongly denying coverage for Proton Beam Therapy for prostate cancer treatment) due to his own prostate cancer diagnosis: "It is undisputed among legitimate medical experts that proton radiation therapy is not experimental and causes much less collateral damage than traditional radiation.  To deny a patient this treatment, if it is available, is immoral and barbaric."  *Id.  See* J. Scola Order, a true and correct copy of which is attached hereto as Exhibit "M."

## CLASS ACTION ALLEGATIONS

96.     Plaintiff brings this action individually and all others similarly situated as a

Class Action pursuant to Federal Rules of Civil Procedure Rule 23.  Plaintiff incorporates herein,

by reference, all other paragraphs and footnotes of this Class Action Complaint as if fully set forth

herein at length.

97.     Pursuant to Rule 23(b)(1) and (b)(2), Plaintiff seeks certification of a class defined

as follows:

> All adult members, participants, and beneficiaries between the ages of 21 and 65,
> of ERISA-governed employee welfare benefit plans administered and/or insured
> by Aetna, whose requests for medically prescribed Proton Beam Therapy were
> denied at any time within the applicable statute of limitations, or whose requests
> for Proton Beam Therapy will be denied in the future, based upon a determination
> by Aetna, through the use of Aetna's own internal medical guidelines, that Proton
> Beam Therapy is not medically necessary, or is experimental and/or investigational.

98.     The Class claims all derive directly from a single course of conduct by Defendants.

Defendants engaged in uniform and standardized conduct toward the Class.  They did not

differentiate, in degree of care or candor, their actions or inactions among individual Class

members.  The objective facts are the same for all Class members.  Within the single Claim for

Relief set forth below, the same legal standards under federal law govern.  Accordingly, Plaintiffs

bring this lawsuit as a Class Action on their own behalf and on behalf of all other persons similarly

situated as members of the proposed Classes pursuant to Federal Rule of Civil Procedure 23.

99.     This action has been brought and may be properly maintained as a Class Action

under the provisions of Federal Rules of Civil Procedure Rule 23 because there is a well-defined

community of interest in the litigation and the proposed class is easily ascertainable. This action

satisfies the numerosity, commonality, typicality and adequacy requirements of those provisions.

> A. **Numerosity:** Upon information and belief, potential members of the
> proposed class as defined are so numerous that joinder of all the members

of the proposed class is impracticable.  While the precise number of proposed class members has not been determined at this time, Plaintiffs are informed and believe that there are a substantial number of individuals covered under plans insured or administered by Aetna who have been similarly affected.

B.    **Commonality**: Common questions of law and fact exist as to all Class members.  Among the questions of law and fact common to Plaintiffs and the Class Members are:

    a.  Do Defendants have a practice of applying the medical policy set forth in CPB No. 0270 to claims for the authorization of Proton Beam Therapy;

    b.  Whether Aetna's use of its medical policy related to Proton Beam Therapy violates its statutorily-mandated requirement to act as a fiduciary with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of: (1) providing benefits to participants and their beneficiaries; and (2) defraying reasonable expenses of administering the plan;.

    c.  What criteria Defendants actually consider in their decision that Proton Beam Therapy is experimental and/or investigational for certain types of cancer, and whether that decision-making process was a separate breach of their fiduciary duty;

    d.  Whether Aetna's continued denial of Proton Beam Therapy to patients whose own physicians have determined the procedure to be medically necessary for their types of cancer is a separate breach of its fiduciary duty; and

    e.  Why Defendants rely on medical directors who are unqualified to render determinations of coverage for Proton Beam Therapy, including medical directors who are not board-certified in the requisite specialty, and whether that reliance was a separate breach of their fiduciary duty.

C.    **Typicality**: Plaintiffs' claims are typical of the claims of Class Members because every cancer patient who was prescribed Proton Beam Therapy by their physicians was denied by Aetna for the reason that Proton Beam Therapy was not medically necessary and/or is experimental or investigational.

D.    **Adequacy of Representation**: Plaintiffs will fairly and adequately protect the interests of the proposed Class.  Plaintiffs have retained counsel competent and experienced in complex class action litigation and with

adequate resources to assure the interests of the Class will not be harmed. The named Plaintiffs are typically situated and have no conflict of interest with the Class as a whole.

E.   **Class Action Maintainable Under Rule 23(b)(1)**: By the creation and implementation of guidelines that treat similarly situated claimants differently, the prosecution of actions by individual class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct with respect to the processing and administration of claims for Proton Beam Therapy treatment, thereby making the claims for injunctive and declaratory relief sought herein appropriate for class certification.

F.   **Class Action Maintainable Under Rule 23(b)(2):** By misrepresenting the scope of the insurance coverage provided by Aetna, its conflicts of interest and breaches of fiduciary duty, Aetna has acted or refused to act on grounds generally applicable to the Class, thereby making the claims for injunctive and declaratory relief sought herein the appropriate remedies for the Class.

G.   **Ascertainability:**  The Class Members are ascertainable as all Defendants can identify every single class member from their own records. Accordingly, mere ministerial acts on the part of Defendants and the potential Class Members will be necessary to ascertain all potential Class Members.

100.   In this action, Plaintiffs seek all statutorily appropriate and available relief from Aetna for violating its duty to act as an ERISA fiduciary with respect to its plan participants, for the reasons set forth below:

## COUNT I: BREACH OF FIDUCIARY DUTY
### (29 U.S.C. §§ 1132(a)(3))

101.   Plaintiffs and the Class Members incorporate by reference the foregoing paragraphs as though fully set forth herein.

102.   As set forth herein, Plaintiffs and the Class Members are participants in or beneficiaries of employee welfare benefit plans or employee benefit plans administered and/or underwritten by Aetna and governed by ERISA.

103.    Aetna acts as an ERISA fiduciary with respect to the administration and claims decisions of the group health benefit plan it issues to employers, such as the Plan and the Class plans, within the meaning of 29 U.S.C. § 1109(a) and 1002(21)(A).  With respect to these plans, Aetna exercises discretionary authority or control respecting management of the plans, and/or exercises authority or control respecting management or disposition of the plans' assets.

104.    Aetna has the authority, and actually exercises the authority, to fund plans or administer self-funded plans (like the Plan), make decisions on claims for benefits and appeals thereof, and to write checks for benefits.

105.    As an ERISA fiduciary, Aetna must act with the utmost prudence and loyalty in communicating to plan participants and beneficiaries and in administering their claims under the plan, and must otherwise comply with the requirements of ERISA, and with terms and conditions of its ERISA plans themselves, in making benefit determinations and processing claims on behalf of plan participants and beneficiaries.

106.    Specifically, and without limitation, Aetna is statutorily mandated to act as a fiduciary with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of: (1) providing benefits to participants and their beneficiaries; and (2) defraying reasonable expenses of administering the plan.  *See* 29 U.S.C. § 1104(a)(1)(A).

107.    In addition, Aetna must discharge its fiduciary duty "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," and "in accordance with the documents and instruments governing the plan."  *See* 29 U.S.C. §1104(a)(1)(B), (D).

108.    Aetna repeatedly violated these obligations and duties to Plaintiffs and the Class Members during the class period in part by the following conduct:

1.  Preparing and implementing Clinical Policy Bulletin No. 0270: Proton Beam and Neutron Beam Radiotherapy, and, upon information and belief, other substantially similar clinical policy bulletins which relied upon outdated medical evidence, ignored evidence indicating Proton Beam Therapy was not experimental, unreasonably concluded that Proton Beam Therapy was experimental and investigational, unreasonably concluded that Proton Beam Therapy's effectiveness had not been established, and relied more heavily on actuarial calculation of risk pools;

2.  Having Clinical Policy Bulletin No. 0270 reviewed and applied to insured members' requests for prior authorization and post-service claims for reimbursement, and in the adjudication of insured members' pre- and post-service claims by internal medical directors who are unqualified to render determinations of coverage for Proton Beam Therapy, including by Aetna medical directors, none of whom are board certified in the requisite specialty; and

3.  By continuing to put its financial interests above those of the Plan participants and beneficiaries to the detriment of those participants and beneficiaries as opposed to fulfilling its duty to act solely for the benefit of the Plan's participants and beneficiaries by providing them benefits.

Because Aetna has categorically and improperly denied Paul and other Class Members' requests for Proton Beam Therapy, Aetna has breached, and continues to breach, its fiduciary duty to Plaintiffs and the Class.

109.    Due to these breaches of fiduciary duty, Aetna violated its own statements to plan participants and beneficiaries to the contrary when it stated that it would, in fact, deliver access to medically necessary healthcare for the treatment of cancer.

110.    In engaging in the breaches of fiduciary duty set forth herein, Aetna elevates its own interests above the interest of the plan participants and beneficiaries, reflecting its conflict of interest when determining whether to cover Proton Beam Therapy.    By preparing and implementing CPB No. 0270, Aetna sacrificed the interests of Plaintiffs and the Class Members

so that it could artificially decrease the number and value of claims it was required to pay from its own assets, and the assets of its employer-sponsor customers – as doing so advanced its own interests in retaining and expanding its business with such customers.

111.    Pursuant to 29 U.S.C. § 1132(a)(3), Plaintiff and the Class are entitled to enforce ERISA and hold Aetna liable for its breaches of fiduciary duty.  As such, Plaintiffs and the Class seek equitable and remedial relief in the form of an Order that provides as follows:

- enjoining Aetna from continuing to issue denials for Proton Beam Therapy based on its internal guideline, CPB No. 0270;

- requiring Aetna to retract its categorical denials for Proton Beam Therapy;

- requiring Aetna to provide notice of said determination in the form and manner required by ERISA to all Class Members who have had prior authorization requests or claims for Proton Beam Therapy denied;

- requiring Aetna to re-evaluate all prior authorization requests or post-service claims for Proton Beam Therapy by Plaintiff and the Class Members under an ERISA-compliant procedure;

- requiring Aetna to provide an accounting of any profits made by Aetna from the monies representing the improperly denied claims, including, but not limited to, fees earned in the processing of improperly denied claims on behalf of its employer-sponsor customers, and disgorgement of any profits Aetna may have realized by virtue of its violations of ERISA and other fiduciary breaches;

- Such other equitable and remedial relief, including, but not limited to, an award of surcharges to make Plaintiff and the Class Members whole as a result of the coverage denials, as may be permitted by law and as the Court may deem appropriate; and

- Attorneys' fees and costs of litigation.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class Members, request relief as follows:

112.    An Order certifying the proposed Class, appointing the Molloys to represent the proposed Class, and designating the Molloys' counsel as Class Counsel;

113.    An Order declaring that Aetna's practices described herein violate ERISA and its ERISA-based fiduciary duties;

114.    Injunctive and other equitable relief as described and requested above;

115.    An Order awarding attorneys' fees and costs of litigation for this action in amounts to be determined by the Court;

116.    Payment of pre-judgment and post-judgment interest as allowed under ERISA; and

117.    For such other and further relief as this Court may deem just and proper.


DATED: DECEMBER 13, 2019            FIRST LAW STRATEGY GROUP, LLC


BY: _____
    FIRST LAW STRATEGY GROUP
    David S. Senoff, Esquire
    Hillary B. Weinstein, Esquire
    121 S. Broad Street, Suite 300
    Philadelphia, PA 19107
    dsenoff@firstlawstrategy.com
    hweinstein@firstlawstrategy.com

    RICHARD M. OCHROCH & ASSOCIATES
    Richard Ochroch, Esquire
    Brett N. Benton, Esquire
    318 South 16th Street
    Philadelphia, PA 19102
    (215) 893-4209
    bbenton@ochroch-law.com
    rochroch@ochroch-law.com

**CERTIFICATE OF SERVICE**

I, Hillary B. Weinstein, hereby certify that on this 13th date of December 2019, I served a true and correct copy of the foregoing Amended Complaint on all counsel of record via the Court's CM/ECF electronic filing system.

FIRST LAW STRATEGY GROUP, LLC

BY:   /s/ Hillary B. Weinstein
      Hillary B. Weinstein, Esquire